## STAR MINING CO. v. FEDERAL MINING & SMELTING CO. [*]

(Circuit Court of Appeals, Ninth Circuit.   May 17, 1920.)

No. 3228.

1. **Mines and minerals ⊂⇒38(18)—Evidence in suit to restrain removal of ore held to show single lode bisected by side lines.**

In a suit to restrain defendant from removing from beneath the sur-face of complainant's claims ore which defendant asserted was in a lode which apexed on his claim, evidence *held* to show that the lode from which the ore was taken was a single broad lode, bisected by the side lines dividing complainant's and defendant's claims.

2. **Mines and minerals ⊂⇒31(1)—Lode bisected by side lines belongs to prior locator.**

A broad lode, bisected by the division side lines between two claims, be-longs to the claim having a prior location, under Rev. St. § 2322 (Comp. St. § 4618), giving extralateral rights to lodes.

3. **Mines and minerals ⊂⇒43—Failure to adverse patent application for con-flicting surface does not determine priority as to lode.**

The failure to file adverse proceedings against an application for patent for a lode mining claim by the possessor of another claim, which con-flicted with the surface of the former, creates no presumption as to priori-ty of discovery, either under Rev. St. § 2332 (Comp. St. § 4631), or other-wise, so that the issuance of patent does not determine the priority of rights to the lode.

4. **Mines and minerals ⊂⇒43—Patent relates to relocation, not to original lo-cation.**

A patent for lode mining claim, which had been relocated by the same parties who originally located, relates back only to its relocation.

Appeal from the District Court of the United States for the North-ern Division of the District of Idaho; Frank S. Dietrich, Judge.

Suit by the Star Mining Company against the Federal Mining & Smelting Company.   Decree for defendant, and complainant appeals. Reversed, with directions to enter judgment for complainant as to ore beneath the surface of two of its claims.

John P. Gray, of Cœur d'Alene, Idaho, and James A. Wayne, of Wallace, Idaho, for appellant.

John A. Marshall and Howat, Marshall, Macmillan & Nebeker, all of Salt Lake City, Utah, and C. W. Beale, of Wallace, Idaho, for appellee.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

ROSS, Circuit Judge.  The appellant, owner of the Evening Star, Evening Star Fraction, and Mary R. Fraction patented lode mining claims, brought this suit in the court below to enjoin the defendant thereto (the appellee here) from extracting ore from beneath the

surface of the Evening Star and Mary R. Fraction claims, and for an accounting of the ore theretofore extracted therefrom; the defendant to the suit claiming and asserting the right thereto by reason of its alleged right to follow a vein apexing in the patented lode claims, Grouse and Iron Crown, owned by it, it being also the owner of the patented lode claims, Morning and Noonday Fraction. All of the claims mentioned are situated in the great Cœur d'Alene mining district of the state of Idaho, the valuable ores of which district are largely composed of lead, zinc, and silver. The case involving a very large amount of money, a number of the most eminent geologists and mining engineers of the country were employed by the respective parties to the suit, who made examinations of the ground and testified at great length. The result of the trial was a decree in favor of the defendant, from which decree the present appeal comes.

The bill alleged, among other things, the complainant's ownership of the Evening Star and Mary R. Fraction claims, within each of which there was a vein or lode of rock in place bearing lead, silver, zinc, and other valuable metals, extending lengthwise thereof, of which claims the complainant was in the exclusive possession, except as interfered with by the acts of the defendant complained of; that the defendant owned the Morning mine, adjoining the Evening Star on the east, and had by means of underground workings therein secretly and without the knowledge of the complainant penetrated at great depth under the surface of the Evening Star and Mary R. Fraction, and into and upon the ore bodies therein, and extracted large quantities of ore therefrom, exceeding in value $500,000; that in the month of January, 1913, in connection with an option which the defendant then secured from the stockholders of the complainant upon their stock, the complainant and defendant entered into a contract by the terms of which the latter was allowed to make certain developments in the ground of the complainant, agreeing, however, that it would not remove any ore therefrom, except such as was occasioned by the development work; that the only development work so made by the defendant, of which the complainant was aware, was at and above No. 5 tunnel level of the Morning mine, and that the complainant had no knowledge of the alleged surreptitious work done by the defendant, and extraction of ores, until November, 1916, which work and extraction the defendant threatens to continue.

The defendant in its answer, after making certain denials of the allegations of the bill, alleged in substance that it had made excavations and extracted ore from beneath the surface of the Evening Star and Mary R. Fraction claims, but within a vein apexing within the Grouse and Iron Crown lode mining claims owned by it, and that its patent from the government for the Grouse and Iron Crown claims was issued prior to the patent issued to the complainant for the Evening Star claim, and that the conflict area (shown upon the plats hereinafter inserted) between the Grouse and Evening Star claims was included within the prior patent to the Grouse, and that the conflict area

between the Iron Crown claim and the Evening Star was included with-in the patent to the Iron Crown; and, as affirmative matter, the defendant alleged its ownership of the Grouse and Iron Crown claims, and alleged that within each of them there is a vein or lode of rock in place, of which it is the owner, extending lengthwise of and through the said Iron Crown claim for a distance of about 1,000 feet east from the west line of the Grouse claim, where it passes through the north boundary line thereof; that the apex of such vein or lode is within the surface boundaries of the Grouse and Iron Crown claims to that extent, and has a downward course northerly, and on such downward course extends outside of and indefinitely beyond the northern boundary side line of the Grouse and Iron Crown claims, into and beneath the surface of the Evening Star and Mary R. Fraction claims, and that all of the work and extraction of ores beneath the surface of the Evening Star and Mary R. Fraction claims was made by the defendant upon and within the vein apexing within the Grouse and Iron Crown claims, in pursuance of the defendant's alleged extralateral rights. Those alleged rights on the part of the defendant to the suit were put in issue by the complainant's reply to the cross-bill.

On the trial the contention of the defendant was that the work done and the ore extracted by it from beneath the surface of the Evening Star and Mary R. Fraction claims was upon a vein which apexed within its Grouse and Iron Crown claims, crossing their lines in such a way as conferred upon the defendant the extralateral rights defined by section 2322 of the Revised Statutes (Comp. St. § 4618); while the contention on behalf of the complainant was that the vein upon which the work in question was done and from which the ore in controversy was extracted was a broad lode bisected upon the surface by the common side line of the Evening Star and Grouse, and by the common side line of the Evening Star and Iron Crown claims, and that as to both the Grouse and the Iron Crown the Evening Star claim has priority, and therefore carried the ownership of all of the ore of the lode or vein beneath the surface of the Evening Star and Mary R. Fraction to the west end line of the Evening Star.

The court below adjudged and decreed, among other things, that by virtue of its ownership of the Grouse and Iron Crown claims the defendant is the owner of the vein in controversy and entitled to the possession thereof; that the hanging wall or northern limit of the said vein, to the extent that it has been worked vertically beneath the surface of the Evening Star, Evening Star Fraction, and Mary R. Fraction claims, is "5 feet northerly from the existing levels, winzes, raises, inclines, and stopes heretofore excavated by the defendant in its working beneath the surface of said claims"; that the Grouse claim was located prior to the location of any of the complainant's said claims, and is senior in date of location and superior in mining rights accruing by reason thereof over any and all of the said claims of the complainant; that the Iron Crown claim was located prior to the location of the Evening Star Fraction and the Mary R. Fraction claims,

and subsequent to the location of the Evening Star claim, and is superior in mining rights accruing by reason of location to said Evening Star Fraction and Mary R. Fraction claims, and inferior to the Evening Star claim, and further adjudged and decreed that all claims of the complainant and of all persons claiming or to claim by, through, or under it, to any portion of the vein adjudged by the decree to be the property of the defendant, are invalid and groundless; and that the defendant's title to such portions thereof, and to all ores and minerals therein contained, be quieted against the complainant, and perpetually enjoining it from asserting any claim thereto, or from entering into or upon any portion thereof.

The court found that the decision of the case did not require the determination of the limits of the vein to the south, and accordingly did not undertake to fix them—the dip being northerly. It is undisputed that from a lode, the apex of which crosses the east line of the Morning claim of the defendant, about 200 feet from its northeast corner and running thence westerly towards its southwest corner, an aggregate amount stated to be from $25,000,000 to $30,000,000 had been taken during the many years it had been worked, prior to the commencement of the present suit. That the defendant was then pursuing the same lode beyond the west end line of the Morning claim, and extracting ore therefrom, beneath the surface of the Evening Star and Mary R. Fraction claims of the complainant, we can but conclude from a most careful consideration of the evidence in the case.

We do not, of course, overlook the insistence of the defendant that the ore extracted by it from beneath the surface of the complainant's claims is a part of the vein apexing within the boundaries of the Grouse and Iron Crown claims of defendant. That the learned trial judge was not entirely satisfied with the conclusions reached by him to that effect clearly appears, we think, from his opinion. Referring to the above-mentioned work of the defendant, he said:

"Looking from the east, the general strike of the stoped area is northwesterly, and the dip, though not uniform, is slightly to the north. The ore shoots, of course, are readily recognizable, but the vein or lode in which they are found is without clearly defined walls or boundaries. It embraces part or all of a broad zone irregularly sheared and irregularly mineralized. By coordinating cuts and other surface openings with the deeper workings, the plaintiff established an apex for the vein in which the stoping has been done from a point a little to the east of the middle of the Morning, longitudinally, and approximately 200 feet northerly from the southerly side line; thence running westerly, intersecting the Morning side line about 450 feet from the southwesterly corner, then intersecting the northerly side line of the Grouse about 600 feet from the northeast corner, and then the west end line almost at right angles about 250 feet south of the northwest corner; and thence with a course almost due west for a distance of about 500 feet in the Iron Crown. This course, which it will be noted is throughout its entire length of approximately 2,000 feet within the defendant's claims, the plaintiff now concedes is upon the apex, or a portion of the apex, of the vein, which, in its lower reaches, embraces the area stoped by the defendant in both the Morning and the Star claims. With this concession, however, it couples the contention that the apex is very broad, the exact width being a question touching which its geologists do not agree. As painted upon its maps, it is shown

as a zone extending in width from the course just described northerly for a distance of approximately 250 feet, and in length from the easterly end of such course westerly to a point about 500 feet west of the common end line of the Morning and Evening Star claims, where it is represented as forking, the smaller portion, from 50 to 100 feet wide, following the course claimed by the defendant, and the larger branch continuing in a northwesterly direction, ultimately intersecting the westerly end line of the Evening Star. Concretely, the plaintiff contends that westerly from the east end line of the Evening Star and the southerly projection thereof to the westerly end line of the Grouse and the northerly projection thereof, the apex of the vein and of the northerly branch lies upon both sides of the common side line of the Grouse and Evening Star, and for a short distance further west on both sides of the common side line of the Iron Crown and the Evening Star, and further that in point of time discovery was made of the Evening Star prior to the discovery of the Grouse and Iron Crown, and that therefore the Evening Star takes the whole of the vein where the apex is bisected by the common side lines. Lawson v. U. S. M. Co., 207 U. S. 1 [28 Sup. Ct. 15, 52 L. Ed. 65]. In these contentions we have the two decisive questions of the case, which, concretely stated, are: (1) Do such common side lines longitudinally traverse the apex of the vein containing the ore bodies in issue? and, if so, (2) is the Evening Star prior in time, and hence in right, to the Grouse and Iron Crown?

The court below very properly said—citing the decision of this court in Migeon v. Montana Central Railway Co., 77 Fed. 249, 23 C. C. A. 156—that the definition of a vein must always have special reference to the formation and particular characteristics of the particular district, and further that the question of width often presents considerations entirely different from those involved in the issue of continuity upon course or dip, adding:

"But the difficulty here is to propose any definition, either general or specific, which will meet the necessities of either party. Without exception, the eminent experts who testified in the case seemed to be reluctant to commit themselves to any formula or description by the use of which another geologist or mining engineer could upon the ground at any given point, with measurable certainty, fix the lateral limits of the vein. Such definitions as were ventured were so qualified, either directly or by subsequent statements and concessions, that in practical application they turn out to be of little service. Indeed, it is pre-eminently a case where each side finds it a much simpler task successfully to assail its opponent's record than to defend its own, and such, apparently, are the inherent difficulties that it is doubted whether for any possible decision geological reasons can be assigned which are not out of harmony with some testimony adduced upon behalf of the party in whose favor the decision is rendered. And yet, when we view the formation in its larger aspects, and consider that upon a strike and dip of substantial continuity the defendant has actually extracted from stopes, the width of which is comparatively narrow and uniform, ore of a value exceeding $25,000,000, no room is left for doubt that we are dealing with a vein or lode, and its limits we must determine as best we can. Whatever the difficulties from a purely scientific standpoint, the problem is an actual one, and demands a practical solution."

Exactly so. Exhibit 38 of the complainant, here inserted, will illustrate the lines of the respective claims and the lode or vein as complainant contends it courses through the Morning claim and therein westerly:

The following exhibit of the defendant shows more distinctly the conflicting areas of the Evening Star, Grouse, and Iron Crown claims:

As an illustration of what the court below said respecting the inconsistencies and conflicts in the testimony of the respective expert geologists, we insert this excerpt from the testimony of Professor Barrell, of Yale, a witness for the defendant:

"Q. Doctor, did you give any consideration to the literature of the district? Did you find anything in it which justified a description of such a vein as this one which you have defined? A. Yes, I read Dr. Ransom's report, United States Geological Survey, professional paper 62, and his descriptions of the Morning vein I thought were good.

"Q. You agreed with them? A. The general description I agreed with. I wouldn't want to assert that I agree with all its details.

"Q. Does he describe any such shear vein as you have described? A. I couldn't answer that question 'Yes' or 'No' without consulting the work and reading it carefully. I read his work before I came out here. After I came I trusted to my own observations.

"Q. I have it here, Doctor, and I presume you regarded that as an authority in assisting you to an understanding of the problem involved? A. I don't regard it—no scientist regards any other scientist as an authority, but you regard some as better than others.

"Q. You don't mean to say that you don't believe one another?

"The Court: What am I going to do about it?

"A. I might add that it is the opinion of the scientists that every scientist should reach his own conclusions. I have a great deal of confidence in Ransom, but of course I wouldn't adopt anything he says without verifying it.

"Q. Just read what he says on page 167, concerning the Morning vein? A. This paragraph: 'Structurally, the Morning and You Like lodes are metasmatic fissure veins in zones of close sheeting, which follow, or cut at small angles, the prevalent slaty cleavage of the quartzite. The fissuring is so close and so intimately related to the general cleavage and fissility of the rocks that parts of the lodes might appropriately be called shear zones. The ore has been deposited along these zones, as the filling of small fissures, as lenticular streaks following cleavage planes, as irregular bunches at intersections of fissures, and as minute reticulated veinlets similar to those of the Bunker Hill and Sullivan mine. Some replacement of the quartzite by ore is everywhere evident and is usually very marked. The ore bodies are without definite walls, but pass gradually, by decrease of galena, into the country rock. Many of the stopes show a conspicuous vertical bending, due to the deposition of ore along gaping cleavage cracks. Individual bands are not continuous for long distances, but pinch out and are succeeded by others. The formation of the lodes seems never to have resulted in the production of large open fissures, but rather in a multitude of narrow fissures, usually less than an inch in width, which enabled the ore-bearing solutions to attack and replace the adjacent quartzite. The ore of the Morning vein is cut by numerous fissures, which are later than the ore. They are structurally unimportant and have no appreciable enriching effect on the ore in their vicinity. One of these fissures follows the main Morning lode, running on the south side of the horse. Others cut the lode at various angles to 90 degrees.'

"Q. Does that generally, do you think, agree with the descriptions that you have been given? A. In general, yes. I would have to analyze it, to guard against saying that I adopted every line; in fact, he states that one of these fissures follows the main Morning lode, running on the south side of the horse. At that time the mule stable horse was not developed. There the fissures inclose it on the north side, and in fact I have seen other fissures on other north sides. There might be minor differences, which would perhaps be due to fuller observation and fuller development."

One of the veins of the Bunker Hill and Sullivan mine, referred to in the foregoing report of the United States Geological Survey, was involved in the case before us of Last Chance Min. Co. et al. v. Bunk-

er Hill & S. Min. & Con. Co., 131 Fed. 579, 66 C. C. A. 299, where the findings of the master, which were adopted by this court, thus described that vein or lode of the Cœur d'Alene district:

"That within the Bunker Hill claim there is a vein or lode of rock in place, carrying silver and lead, commonly known in the district as the 'Bunker Hill Lode,' the apex of which is indicated by the outcrop of the foot wall, which traverses the claim in a general northwesterly course from where it cuts the south boundary; that the foot wall is the well-defined and persistent feature of this vein, and enters the Bunker Hill claim at a point on its south line about 300 feet from the southeast corner, and, extending along its course at the surface northwesterly, passes out of the north line of the claim about 726 feet from the northeast corner of the claim; that the Bunker Hill lode has no physical hanging wall, no marked line complement to the foot wall, in defining the limit of the fissure; that for its underlying boundary it has a well-defined, continuous bed of barren quartzite, but for its overlying boundary it has only an irregular and vague outline of the limit of mineralization, from which fact, and the peculiar geological formation of the lode, it is very difficult to define this limit with any degree of certainty, for which reason much confusion and some contradiction appears in the testimony upon this point; that the weight of the testimony shows, however, that the mineralization of this lode or ledge extending from the foot wall into the hanging wall country gradually fades in value until a point is reached 350 or 400 feet out, where the rock is practically barren."

The great Eureka Lode of Nevada (Eureka Case, 4 Sawy. 312, Fed. Cas. No. 4,548, many times referred to in subsequent cases) was bounded on its south side by a wall of quartzite several hundred feet in thickness, and on its north side by a belt of clay or shale ranging in thickness from less than an inch to 70 or 80 feet. Not so in the present case, nor in any of the lodes of the Cœur d'Alene district that have been brought to the attention of this court in preceding cases. In the present one it is undisputed that all of the mineral in the area in question is found in a formation of quartzite more or less sheared by the forces of nature, but without any fixed walls susceptible of identification. The portion of the sheared zone to which the term vein or lode can be rightly applied is strenuously contested. Its greatest width that we find stated by any of the witnesses is about 300 feet. The court below by its judgment, as will have been seen, fixed its limit on the only side on which its limit was involved at 5 feet northerly from the existing levels, winzes, raises, inclines, and stopes heretofore excavated by the defendant in its working beneath the surface of the Evening Star, Evening Star Fraction, and Mary R. Fraction claims.

It is obvious that such action, while no doubt the best "guess" the court felt able to make, was purely arbitrary, and such as, in our opinion, cannot be sustained upon the record. It is always to be remembered in the consideration of all such cases that, where there are well-defined walls, they determine the bounds of the vein or lode, but that, where there are no walls, continuous ore bodies determine the width; such continuity, however, not being destroyed or affected by subsequent interruption through the forces of nature. Few, if any, veins or lodes of any substantial length are composed of but one solid body of pay ore; and certainly the vein or lode here in question cannot be

considered one of the exceptions, if there be any. Indeed, the evidence shows, we think, beyond doubt, that much of the substantially mineralized portions of this lode have not been worked, because the prices of its minerals were at the time too low to make it profitable to do so. But surely neither a variation in prices, which it is a matter of common knowledge frequently occurs, nor any change in working conditions, constitute a true test of the question as to the extent of the vein or lode.

Sufficient reference has already been made to the inconsistent testimony and opinions of the distinguished geologists of the respective parties, the nature of which confirms us in the opinion that in the consideration and decision of such cases it is safer, and consequently more satisfactory, to rely upon the testimony of expert mining engineers, who are familiar with the mineral formations and deposits of the particular district, and upon the actual work and observations of experienced mining superintendents who have active charge of the work in such mines. It is, of course, practically impossible to refer in detail to the very voluminous evidence in the case, including the very numerous assays, a number of which are referred to in the opinion of the court below; but we insert a description of the lode given by one of the defendant's experienced engineers, who was not only familiar with the lodes of the district, but was, from December, 1907, to December 31, 1909, superintendent of the Morning mine, and also a description thereof, given by one of the experienced engineers of the complainant, who was also familiar with the Cœur d'Alene lodes and veins:

The first of these, William B. Fisher, a witness on behalf of the defendant, being asked by its counsel to describe the Morning vein, said:

"The Morning vein in my judgment, and after an experience with fissure veins, of which I think it is one type, covering 34 years, I should say it belonged to the type of vein that I should call a shear-zone vein. In my experience as a mining man there are four types of fissure veins. One is a clear crack of more or less solid rock, that probably was open and free from crushed rock during the time it was filled by the mineral-bearing vein.· That is usually crushed in such cases. I should call that a cracked fissure. Then there is a type of fissure that is the result of a dyke forcing itself up through a much more solid rock and entirely occupying the crack it made in coming up. Those dykes are sometimes entirely or practically replaced by other material, ore-bearing. That I call a dyke fissure. The third type is a fault fissure, where the rock composing the mountain or the country has moved considerably up and down and lengthwise, either or both, and has moved so much and so powerfully that the rock left in it has been ground to what is called gouge. That gouge is sometimes mineralized by infiltration and sometimes actually replaced, and you find the minerals sometimes filling such fissures from wall to wall, and sometimes specked through the outer gouge. I call that a fault fissure vein. The fourth type is where there has been a fault fissure, in my judgment with very little movement, but with a great deal of pressure, and there the rock inclosing or through which the faulting went has become cracked and broken, but not ground up so fine as a whole as the fault fissure type. I call that a shear-zone fissure, and I think the Morning vein is a very excellent example of a shear-zone fissure.

"From my experience in this neighborhood there are a series of those, of that type of fissure, occupying the ridge and series of ridges between the Hunter mine at Mullan and the Frisco mine in Canyon creek. So far as I

have seen, the Morning fissure is the largest and strongest. These other fissures that I have been into there have a generally parallel course to the Morning. None of them run at right angles to it, for instance, or at a 45-degree angle. So far as I have seen, they are all more or less parallel, from which I infer that the fissuring took place from a general strain all the way down that ridge. This characteristic of the shear-zone fissure, of it being made up of crushed rock, rather than rock ground to a powder, takes it out of the fissure class, where you find very clearly defined walls, because this crushing and cracking does not extend along two smooth planes, and when the mineralizing waters come in there they went through the most open cracks gradually, and then under pressure infiltrated through smaller cracks, and in some cases alter, replace—in fact, in most cases, and I believe in this case, altered the character of the quartzite. These cracks do not correspond absolutely to a smooth wall, but the area of cracked and crushed matter that has been mineralized, so that it can be considered a mineral vein, is fairly well defined. Beyond the fairly well defined vein you will often find little cracks, that went up either parallel with it, usually parallel with it, or little places that must have been slightly opened, because they are now filled with lenses of different material, usually galena and zinc ore; but the main vein of the Morning mine, the main part of this fissure which shattered the rocks in there, has no regular walls. I would use the miners' expression of saying the mineralization faded away after a while into the walls on each side. In other words, beyond the portion of the vein where it is heavily mineralized and makes in many cases commercial ore, and would make commercial ore in more cases if lead would stay up to 8 cents—beyond that area there is more or less mineralization, but it is of the fade-away type, more near the vein and less as you go away from it as a rule. This vein does not outcrop on the surface in a ridge of rock, as some veins do where they are harder than the surrounding inclosed rock, like the well-known veins of California, where you can often see the outcrop for 10 miles, sticking up like a long white stone wall. I think in this case the only outcrop that actually came through the surface soil or the detritus was on the Iron Crown. There I think a small portion outcropped or actually came through the detritus, or stuck up in the ore so it could be seen. Points of outcrop marking the apex near the surface come so near the detritus that there is a considerable amount of vein material, which is more porous and more different in formation from the detritus inside when you get away from this vein. I may say here that in my judgment the shear zone forming the Morning vein is from 20 to 110 feet wide. Beginning at the west end, at this more or less mineralized outcrop on the Iron Crown, there were in my time as superintendent several tunnels driven in and along what I recognize as the Morning vein."

One of the complainant's engineers, of much experience and distinction and familiar with the lodes of the Cœur d'Alene district, Mr. Horace V. Winchell, in answer to a question of counsel to state in his own way the character, extent, and situation of the lodes, veins, and ore bodies in the Morning and Star mines, making reference to such documents, maps, and exhibits as he wished, said:

"In describing the particular properties with which we have to do here, it seems to me necessary first to establish a comparison with some particular types of ore deposits in general, and to, as it were, adjust our mental attitude. A geologist or mining engineer, coming into the Cœur d'Alene district for the first time—I judge not alone from my own experience, but from the general experience—is somewhat puzzled by the vein matter disclosed here. The veins and lodes of the Cœur d'Alenes do not find their precise analogy in any camp with which I am familiar. The vein material is quartzite. So is the country rock. We have to do with mineralization in a rock which contains an extremely high per cent. of silica, one of the most difficultly replaceable materials. Nevertheless we are confronted with some of the most important deposits of lead and zinc in the country. We find examples of mineralization on an unusual scale, and it is necessary, as I say, to change our con-

ception somewhat, or our preconceived notions of the form and nature and origin of the deposits which we find.

"There are three general methods or steps, perhaps, I should say, in the formation of such ore deposits as are found here. The first step—and now, when I speak of steps, I do not mean that in all cases these steps are chronologically followed one after the other in the same order. The first type of mineralization, then, which I will mention, is that of disseminated mineralization. Solutions rising toward the surface carrying metallic substances in solution will follow the lines of least resistance. They will work through the more open and porous rock. They will replace the most easily dissolved minerals in those rocks. We have in some camps and in this camp a type of deposit known as disseminated lodes. These disseminated lodes in some camps contain copper. In this camp likewise they contain copper. It is not essential, for the formation of a disseminated lode, that there should be any fissure vein, that there should be any walls, that there should be any shearing. It simply requires a more or less porous rock through which the solutions may pass. Such disseminated lodes may have a very great extent. Some of the porphyry coppers are excellent illustrations. From the size of the Utah copper, 3,000 or 4,000 feet in width and 5,000 feet in length or more down, we have examples of disseminated mineralization. They are truly lodes. They are irregular in form. They have indefinite boundaries. In this camp the Snowstorm and the National Copper, already referred to, are examples of disseminated mineralization. If along that general line of deposition, which has already been partially mineralized by dissemination, we should have the accidental passage of a shear zone we might have— (Thereupon a certain map was marked Plaintiff's Exhibit No. 65.)

"A. Referring now to Plaintiff's Exhibit 65, I have illustrated upon a white sheet an irregular, somewhat lenticular, outline, with disseminated mineralization indicated by red dots. In addition to this primary or this type of mineralization, a shear zone may be produced having as its major axis, or following along the major axis of this lenticular deposit. We then begin to get some structure. We have the famous hammock structure developed, overlapping, reticulated, more or less parallel fissuring of minute displacement, furnishing slender channels, which in any plane of cross-section will look like filaments. Along these reticulated fissures may be deposited still more mineralization. We would then have a shear-zone deposit or lode. If this shear zone, which, by the way, still has no definite, sharp boundaries, has no positive walls, be now sharply stressed, and a fracture extending to the deep be created, we may have following along this shear zone, which, in its turn, follows a disseminated lode, more or less fissuring. These fissures may be subsequently faulted by later fissures. Before the faulting, mineralization may have occurred, which assumes a more or less parallel linear structure and form. Thus we may have what we always expect to find in a large and important lode, the evidence of a complex history. No great mine was ever created quickly. Every large mining camp is the product of a long series of geological events. It represents the cumulative mineralization of ages, and in it you are apt to find the indications of mineralization of different types. What we are concerned with as a mining proposition is the lode as we finally find it. We are looking for the ore. The ore is deposited, as was well expressed by Mr. Burbridge, and wobbles about through a wide vein. It extends throughout the extent of the sheared area, but not always to either wall or either boundary. It follows some of these fissures, but not always to the same extent, nor with the same kind of mineralization. The fissures themselves furnish a line of easy tracing, because they are likely to follow the direction in a general way of the mineralization already in a primary manner deposited. In our conception of veins we are likely to speak with particular reference to the fissures and the fissures alone. We forget and overlook the perfectly obvious previous history and mineralization before our very eyes. As an illustration of the kind of mineralization that I refer to, I have two samples. (Two samples of ore were marked as Plaintiff's Exhibits 66 and 67.)

"A. (continuing). The sample marked Winchell 1, or Plaintiff's Exhibit 66, is a sample of quartzite. The quartzite constitutes far over 90 per cent. of the vein filling of this district. It would probably be safe to say more than

95 per cent. This is a sample of the quartzite. Now, casual examination doesn't instantly lead to the impression that that is vein material. The vicinity from which this sample came has been examined by a number of eminent geologists, not one of whom discovered that it was vein material, as nearly as I can ascertain. If your honor will observe, you see very little ore in that specimen. I now wish to wet it a little and bring out the ore. It will now be seen to be full of disseminated galena and zinc material. It is disseminated ore, quartzite, full of mineralization. That sample came from No. 1 crosscut west, or 368. It is not one of the small ore streaks so frequently and constantly referred to here, but it can be found for a considerable distance between stations 567 and 616. This is on the Morning No. 4 tunnel level. Through the northern end of the crosscut for 40 feet we have that type of disseminated mineralization. Plaintiff's Exhibit 67 is also a sample illustrating disseminated mineralization, and contains the typical spotted appearance and structure, with galena minerals, and it is found in the Star tunnel level, between stations 376 and 377, outside of the small seams of high grade ore which have been referred to in that drift. This again is improved by wetting, although it is possible to see the mineralization in the dry quartzite.

"Mr. Macmillan: Between what stations, Mr. Winchell? A. 376 and 377. I should like also to refer to the sample of quartzite last introduced by Dr. Leith.

"Q. Plaintiff's Exhibit 64? A. Plaintiff's Exhibit 64. There is a sample which appears to be as white and unmineralized as any quartzite in the camp. Under the hand or pocket lens it is seen to be abundantly mineralized with galena. In other words, this is a very unusual example of complex, compound mineralization; and it is not sufficient, in determining whether or not we have to do with a lode, to consider merely the small reticulating seams which follow the hammock structure, nor the fractures and fissures which may be followed along it. In my opinion what has been referred to as post-mineral fissure is really inter-mineral. There has been some mineralization even subsequent to the formation of those fissures. But they are the last structural features in the ground. They do cut every other structure. They may be therefore more reliably counted upon to pursue their way through every other structure, and where you find them in two places you are better justified in assuming their continuity between than is the case with any previously existing structure in those grounds. Now, from a geologist's point of view, and that is the point of view I have adopted in conducting explorations, a certain amount of assumption, a certain amount of projection, is justified. We go upon general structure and upon surface and underground indications in drawing our conclusions as to the direction, the position, of veins and geological structures in general. An examination of the surface of these claims discloses, by means of shallow workings, and the distribution of the float or wash, very strong indications of the existence of a lode. From the Cunningham tunnel near the west end line of the Evening Star in an easterly direction have been made occasional openings, as far as the eastern end line of the Evening Star lode claim. Passing up the hill toward the east there is easily distinguished a scattering of vein float, iron-stained, honeycombed quartz, and sheared quartzite. This float cannot be traced north of a pretty general line. Its southern limit is extremely irregular, or, as far as I can state, not easily ascertainable, but that it does not go higher up the hill than about the position of the red gauze upon the model, Plaintiff's Exhibit No. 36, I can testify from my own examination.

"There is also a line of development substantially as indicated by the position of the apex of the vein on defendant's model. These developments indicate and show clearly the existence of a fissure, one or more fissures, but a fissure, mineralized and underground, shown to be following within or alongside of the wide zone of mineralization, which I would call the Evening Star-Morning lode. Coming to the east from the Cunningham tunnel, we observe that the northern line of developments and floats converges with the line of developments made upon this fissure. They come together before we reach the eastern end line of the Evening Star lode claim. That is in a gulch and the surface exposures are rare, if any exist; but upon both sides of the gulch tunnels and developments have been made. Underground, going to the

Star tunnel first, we find a lode of considerable importance developed by drifts, crosscuts, and a raise, a lode showing disseminated mineralization, shear zone, and later fracturing, along which there is, especially where they pass through, where the later fracturing passes through the prior mineralization; along there we find some additional deposit of mineral and quartz, and sometimes a little richer ore, but as a rule there is no difficulty in distinguishing the fact that a later fracture, and—by that I mean a fracturing that continued for a long time, starting perhaps at a very early period, but subsequent to the major portion of the mineralization—we find a vein which in its course corresponds to the direction upon the surface of this line of float and these surface workings, and which likewise brings us to the southeast into the immediate vicinity of the workings of the Morning mine, going toward the west. We there have certain crosscuts which, taken together with other cross-cuts that I will mention later, show that we are within a large shear zone, which contains disseminated mineralization and mineralized seams and fissures. There is a working on the No. 5 tunnel level which confirms us in our view as to the general strike and dip of the Star vein. On the other hand, working our way west, coming in from the east side of the mountain through the No. 5 tunnel, and following along the vein which we encounter in that tunnel, we find there a shear zone; we find there fissuring; we do not find continuous mineralization of any importance; we do not find ore for hundreds of feet after we first encounter this vein. But we follow along finally in stopes, and from those stopes we go in a northwesterly direction along those stopes, keeping in mind the development up and down, and we arrive in the same complex which we have reached and followed southeastward from the Star workings to the west. In other words, by approaching the questionable—I should say perhaps the controverted—territory, from the two opposite directions, we are led, without the interruption of a single structural break, without passing through the wall of a single vein of any great magnitude, where you can distinguish wall rock from vein material, constantly through the same sheared, crushed, mineralized vein material.

"Now, the mineralization, I forgot to mention. We have here mineralization in this lode—first, the siderite; second, the quartz; third, zinc; fourth, galena; by zinc I mean sphalerite; fifth, pyrite; sixth, barite; seventh, as illustrating and indicating alteration, chlorite and sericite; and in the upper levels we have the oxidized products of many of these minerals, the siderite going into limonite, and the pyrite doing the same thing. I forgot to mention manganese. We likewise have some manganese mineralization. And while I am talking about that I would like to point out the barite. No. 5-S from the south crosscut raise, 85 feet south of the main drift, No. 5 drift, east side, second floor, you will see white mineral there, lots of it, which looks like quartz, but is soft. Throughout the mine in many places, through the Star mine and the Morning, I have observed veinlets, independent, cutting more or less through the sheared quartzite filling of the lode, and in connection with the galena itself sometimes a deposit 4 or 5 or 6 inches thick of barite. Thus we have the evidences of complex mineralization. The fact that this great lode is not everywhere equally and uniformly mineralized is one of the puzzling features at first. A person coming in the No. 6 tunnel level, crosscutting the country quartzite for nearly 2 miles, and arriving in the vicinity of an enormous mine from which have been taken, as I believe, some $30,000,000, is perfectly nonplussed to pass directly through that lode, and to see perfectly clearly on all sides of him, on both sides of him, the country rock, and not one single stopable shred of ore. The same thing is true coming in the No. 5 tunnel level. We have other stretches of ground over a long distance, however, which are not mineralized or stoped.

"What has been called the Iron Crown branch of this lode, something which I recognize perfectly, has been developed for a length of perhaps 1,000 feet without any stoping mineral having been discovered. In other words, we have here what might be called an analogue to the ore shoots in fissure veins. Veins which are typical fissure veins, and which are mined for long distances, and which are perhaps completely filled with quartz, may still contain the values in well-developed ore shoots pitching to one direction or the other down the dip of the vein, but lying within it. Here we have an ore shoot in the

Morning extending westerly to pretty nearly the end line, or beyond the end line, on some levels into the Star ground. Then we jump over a certain portion of the ground and find another ore shoot, the top of which only has been extensively developed so far.

"There is every reason to believe that with greater depth the ore shoot in the Star will assume greater length and continuity. I think it is unnecessary to enter into the particular discussion of the showings in each one of these workings that have led me to this conclusion. I am describing now my conclusion in connection with the general developments that have led to that conclusion, and my conclusion is that we have, passing through the Evening Star and Morning lode veins, also as to one of its branches, passing through the Iron Crown, and across a portion of the Mary R. Fraction, a lode, a geological unit of complex structure, of diverse mineralization, but all precisely the same character as other lodes in the Cœur d'Alene section, a lode which has a width of from 100 to 300 feet, perhaps, a lode which has been developed and can be easily recognized along the strike for a distance of nearly three-quarters of a mile, perhaps more than that, a lode which contains ore here and there, which contains more or less mineral throughout, but which contains stopable ore in certain localities, whose position has been determined by a combination of mineralizing agencies and structural deformations. That this lode is the same identical lode which can be followed and has been followed from the surface downward to the No. 6 tunnel level, and that it passes through both end lines of the Evening Star lode upon the surface; that it is the same identical lode upon which the principal portion of the stoping in the Morning claim has been accomplished; and that these stopes pass westward across the end line of the Morning claim and beneath the Evening Star surface.

"Q. Mr. Winchell, is the outline of the apex of that lode as shown upon the surface map of the plaintiff substantially as you find it? A. It is. The question of outline is one which cannot be accurately, definitely determined. It is a matter of interpretation from the nearest exposures and development. The mineralization of the disseminated lode and of the shear zone fade out into the country, and it is only by taking together structure and mineralization that we are able to fix any definite boundary to this lode.

"Q. There are some places to which I desire particularly to direct your attention, and I want to start at the surface. Have you examined the points marked discovery upon the Evening Star lode? A. I have examined it.

"Q. Will you describe what you saw there? A. I saw a pit which had fallen in. It perhaps has a depth at the present time of 5 feet, not more, I should say. Upon the material, in the material which had been thrown out of this pit, there were fragments of rock, which appeared to have been broken from the solid ledge. Some of these fragments were iron-stained. They contained little seams of honeycombed quartz, and they were considerably sheared. I should judge that it would not be unreasonable to conclude that that discovery was in the same kind of material as that which is found upon the surface of some of the best ore showings in the mine. As to whether or not they came out of that place, and whether or not there is certainly a vein there, I am unable to say.

"Q. Is the material itself such as you would expect to find at the outcrop of such a lode? A. I have seen precisely that kind of material forming the outcrop of lodes in this district.

"Q. I desire to direct your attention to the Evening Star tunnel. Does it disclose the lode as it is shown upon the maps of the plaintiff? A. I think it unquestionably discloses a portion of this lode. It passes through sheared, iron-stained, hammock structure, precisely such as I should expect to find over the unmineralized, or the lesser mineralized, portions of the Evening Star-Morning lode.

"Q. Do you find more or less mineralization in that? A. It is mineralized to a considerable extent along small planes of fracturing and cleavage.

"Q. Will you, Mr. Winchell, go to the model and show what you believe to be the continuity of this lode from the workings in the Star to the Morning workings, calling particular attention to the crosscuts that you said you would come to later? A. The Star tunnel level intersects the lode at a point be-

neath the Morning Star claim. From that point in a southeasterly direction we have workings which are irregular, and in fact most of the workings in the mine are irregular. This irregularity does not always indicate a corresponding irregularity either of the particular structural feature which is being followed, whether a vein or fault, or of the larger lode within which this structural feature may lie. We have here crosscuts, we have drifts and workings, whose general course is well illustrated by the red celluloid sheet upon the model. Following these workings to the southeast, we find ourselves immediately beneath No. 368 crosscut in the No. 4 tunnel level, and vertically beneath the disseminated mineralization illustrated by Exhibit No. 66, Plaintiff's Exhibit 66. We also find that we are vertically over the 303 crosscut, and the raise which goes up from the east end of 303 drift, both of which disclose, not only the lode with its shear structure, but excellent ore bodies. I have heard a great deal of reference to the small seams or streaks of ore in the 303 crosscut. As a matter of fact, it is a first-class vein from end to end, much better for the southern 60 feet, but comparable in every respect with the material that you see in the tops of the broad stopes going west, when they stop taking the material out because it is a little bit below the grade required. I like to have ore, and I like to have a vein to work on, but I am not so exacting as to require more than one one-thousandth of 1 per cent. gold. That makes $6.40 per ton, and I should call that gold ore. In that respect I don't agree with my friend Mr. Fisher. Here we have good vein material almost directly underneath the Evening Star tunnel, and if that is continued, as I presume it will be, it will unquestionably enter the stopes themselves, which have been made along the mineralized margin of the ore shoot toward the east, on the southern side of the Evening Star-Morning lode.

"Q. Mr. Winchell, while we are right at 303 crosscut, where 303 drift cuts the 303 crosscut, what is the fact as to the presence of ore there? A. That is what I was describing. There is a splendid showing of ore, and it runs in every direction. You can sit there and see the quartzite mineralized throughout, much better mineralized than the samples of mineralized quartzite I showed here, and through the seams of solid mineral running southeasterly and westerly and northeasterly a regular intersection of mineralized seams."

[1] Taking and considering the evidence as a whole, we cannot avoid the conclusion that the lode pursued by the appellee in its work beneath the surface of the Evening Star and Mary R. Fraction claims of the appellant is the same great lode it followed and worked by virtue of its ownership of the Morning claim, which lode, after coursing westerly through that claim, enters the Evening Star and Grouse claims across the easterly end line of the Evening Star, and still coursing westerly branches at a point underground not definitely fixed by the evidence, the northerly and larger branch passing through the Evening Star claim and across the northeasterly corner of the Mary R. Fraction claim, and the southerly branch across the westerly end line of the Grouse, and for about 500 feet into the Iron Crown claim, and, further, that the outcrop of the lode is bisected by the common side lines of the Grouse and Evening Star claims and of the Iron Crown and Evening Star.

[2] That a lode or vein so bisected by the lines of two adjoining claims belongs to the one having priority is well established. Lawson v. United States Min. Co., 207 U. S. 1, 12, 13, 28 Sup. Ct. 15, 52 L. Ed. 65. It is, of course, not contended that any extralateral rights appertain to the Morning claim, but the strenuous contention of the appellant is that the vein or lode that crosses the northerly side line of the Grouse claim, and across its end line and into the Iron Crown, is a separate and distinct vein, the extralateral rights to which be-

long to the appellant by reason of its ownership of the Grouse and Iron Crown, and that it is upon that separate and independent vein or lode in and upon which the appellee entered and from which it extracted ore, and claims the right so to do beneath the surface of the Evening Star and Mary R. Fraction claims of the appellant.

[3] Even if it be conceded that the vein or lode last referred to—that is to say, that crossing the northerly side line and westerly end line of the Grouse, and into its adjoining Iron Crown claim—be the vein from which the appellee extracted the one in question, we are of the opinion that the extralateral rights thereto claimed, as against the Evening Star and Mary R. Fraction claims, do not exist. The Grouse was located September 14, 1886, and the patent therefor was issued January 8, 1897. The Evening Star was located January 1, 1887, and the patent therefor was issued July 21, 1904. The Iron Crown was originally located September 1, 1884, and relocated by the same parties August 14, 1888, and patent therefor was issued January 8, 1897.

[4] In respect to the latter claim the court below properly held that the patent thereto related back only to its relocation, and accordingly that it is subsequent in time and inferior in right to the Evening Star claim. Although both the Grouse and Iron Crown claims overlapped to a small extent the Evening Star, as will have been seen from the diagrams heretofore inserted, the owners of the Evening Star did not contest in the Land Office the issuance of patents for the Grouse and Iron Crown claims, which consequently covered those entire claims, including the area in conflict.

In the case of Bunker Hill & S. M. & C. Co. v. Empire State-Idaho M. & D. Co., 109 Fed. 538, 48 C. C. A. 665, this court held, among other things, that an application for a patent of a mining claim carries with it an implied, if not an express, allegation that the location was made upon ground at the time open to location, and was therefore prior to the location of any one else, and that the issuance by the government of a patent therefor conclusively determines the priority of that location over any other, and confers upon the patentee, not only the title to the entire surface of the claim, but also all extralateral rights given by statute, as against the owner of an unpatented conflicting claim, saying (109 Fed. at page 544 et seq., 48 C. C. A. 672), after referring to section 2326 of the Revised Statutes (Comp. St. § 4623):

"The claim that the applicant is by the foregoing provisions of the statute authorized to purchase and receive a patent for, upon full compliance with those provisions, is the claim that he was by preceding provisions of the same statute authorized to locate, namely, one upon unappropriated public land of the United States of the character described in the statute. The application for the patent, therefore, necessarily carried with it, if not an express, certainly an implied, allegation that the location upon which the application was based was made upon land open to location, and therefore was the prior location. * * * The issuance by the government of its patent after due notice to all the world of the application, and ample notice to every one to contest it, conclusively determined the priority of that location over every other, including the Stemwinder, and conferred upon the patentees and their successors in interest not only the entire surface of the claim, but the extralateral right conferred by section 2322 of the Revised Statutes to follow on their dip outside of the side lines, and within vertical planes drawn through the parallel end

lines extended in their own direction, all veins, lodes, and ledges, the tops or apexes of which lie inside the surface lines of the claim."

One of the authorities upon which this court based that decision was the case of Del Monte Min. & Mill. Co. v. Last Chance Min. & Mill. Co., 171 U. S. 55, 75, 18 Sup. Ct. 895, 903 (43 L. Ed. 72), decided May 23, 1898, in which the Supreme Court declared:

"The location upon the surface is not made with the view of getting benefits from the use of that surface. The purpose is to reach the vein which is hidden in the depths of the earth, and the location is made to measure rights beneath the surface. The area of surface is not the matter of moment; the thing of value is the hidden mineral below, and each locator ought to be entitled to make his location so as to reach as much of the unappropriated, and perhaps only partially discovered and traced vein, as is possible."

Some years later, in the case of Lawson v. United States Min. Co., 207 U. S. 1, 28 Sup. Ct. 15 (52 L. Ed. 65) the court held that, while one in possession of the surface of a mining claim under a patent from the United States is presumably in possession of all beneath the surface, and may sue to quiet title to a vein beneath such surface and to enjoin the removal of ore therefrom, if in the proceeding in the land office for the procuring of such patent no adverse claim was made, the patent carries no presumption that anything was considered or determined except the question of the right to the surface, saying (207 U. S. at page 16, 28 Sup. Ct. 20, 52 L. Ed. 65):

"A patent is issued for the land described, and all that is necessarily determined in an adverse suit is the priority of right to the land. This is evident from section 2325, Rev. Stat., which says: 'A patent for any land claimed and located for valuable deposit may be obtained in the following manner.' In the section the only matters mentioned for examination and consideration relate to the surface of the ground. There is no suggestion or provision for any inquiry or determination of subterranean rights."

In the late case in this court of Butte & S. Copper Co. v. Clark-Montana Realty Co., 248 Fed. 609, 160 C. C. A. 509, this court, as in duty bound, followed the decision of the Supreme Court in Lawson v. United States Min. Co. supra, saying:

"The doctrine of the decision in the Lawson Case is that an adjudication by the land office of the question of surface rights does not necessarily determine the question of underground rights, and that, those rights not being subject to adverse claims, the failure to adverse does not estop the parties to litigate the question of priority."

Therefore we must now take the law to be that the question of priority of discovery as between the Evening Star claim of the appellant and the Grouse claim of the appellee was not determined by the issuance to the latter of the patent for the Grouse claim, and, the question of priority of discovery not being thus determined, we are unable to see how the Grouse patent can be held to carry any presumption or inference respecting the question of priority of discovery as between the Evening Star and the Grouse claims, for in the Lawson Case, as has been seen, the Supreme Court distinctly adjudged that the government patent to such claims carries "no pre-

sumption that anything was considered or determined except the question of the right to the surface."

Yet, but for a presumption or inference in favor of the Grouse claim in that regard indulged by the court below, the latter expressly declared it would find from the evidence (and we think rightly) that the statutory discovery was first made upon the Evening Star claim. The court below in its holding in that respect relied upon the decision of this court in the case of Vogel v. Warsing, 146 Fed. 949, 951, 77 C. C. A. 199, 201, where, one of the points relied upon by the appellant being that the record contained no proof of the discovery of gold in the ground in dispute, this court said, in answering the point:

"It has been held that under such circumstances the certificate of location creates a presumption of discovery of mineral and of a valid location. Harris v. Equator Mining & Smelting Co. (C. C.) 8 Fed. 863, 5 McCrary, 14; Cheesman v. Shreeve (C. C.) 40 Fed. 791; Cheesman v. Hart (C. C.) 42 Fed. 98. Especially should such a presumption be indulged in a summary proceeding instituted at the beginning of a suit, where the granting or withholding of an injunction depends upon facts presented by affidavits and rests largely in the discretion of the trial court, and where a subsequent locator attacks the title of the prior locator or that of his successor in interest."

Not only did the Supreme Court hold in the Lawson Case that no such presumption arises even by virtue of a patent, but at its present term, in the case of Cole et al. v. Ralph, 252 U. S. 286, 40 Sup. Ct. 321, 64 L. Ed. ——, it has held that, where there is much evidence tending to show a discovery within the boundaries of a lode claim, as well as possession, working of and claim to the ground as such lode claim, prior to entry thereon by a placer claimant, no presumption of evidentiary character in favor of a valid discovery can come to the aid of the possessor and asserted owner of such a lode claim by virtue of section 2332 of the Revised Statutes (Comp. St. § 4631) or otherwise.

It results from what has been said that the judgment of the court below must be and hereby is reversed, with directions to enter judgment for the complainant as respects all ore beneath the surface of its Evening Star and Mary R. Fraction claims, with costs—the ore beneath the surface of the Evening Star Fraction claim as to which the court below also gave the appellee judgment not being involved in this suit, since the pleadings in the case do not embrace that claim.

Reversed, with the directions above stated.