STATE EX REL. BOSTON & MONTANA CONSOLIDATED COPPER & SILVER MINING CO. ET AL., RELATORS, v. DISTRICT COURT OF THE SECOND JU-DICIAL DISTRICT ET AL., RESPONDENTS.

(No. 2,019.)

(Submitted January 4, 1904.   Decided March 14, 1904.)

*Injunction — Trespass on Mining Property — Contempt Proceedings—Determination of Title—Evidence—Sufficiency.*

1.   In a proceeding to punish for contempt in violating an injunction restraining defendants from working mining properties decreed to be the property of plaintiff, much of the evidence to show that the properties on which

defendants worked belonged to plaintiff was speculative, and based on projections made on conclusions from facts observed in workings remote from the points in controversy. *Held* not sufficient to sustain a conviction.

2.   Plaintiff in an action for an injunction to restrain trespass on a mining claim alleged that another cause of action, which was stricken from the complaint, was for damages for trespasses on veins lying south of the vein with reference to which injunction was sought, and the court found all the issues for plaintiff. On a subsequent proceeding to punish defendants for violation of the injunction the evidence showed that the veins with reference to which the injunction was alleged to have been disobeyed were the only ones south of the vein involved in the injunction suit. *Held,* that the title to these veins was not determined by the injunction suit.

3.   Contempt proceedings for violation of an injunction restraining trespasses on mining property cannot be resorted to for the purpose of determining the title to veins, the ownership of which was not determined in the injunction suit.

APPLICATION for a writ of supervisory control by the state, on the relation of the Boston & Montana Consolidated Copper & Silver Mining Company and others, against the district court of the Second judicial district of the state of Montana and the Hon. William Clancy, judge thereof, to vacate an order adjudging relators guilty of contempt.   Order vacated.

The following are the diagrams referred to in the opinion:

DIAGRAM 1.

## SECTION A.

## SECTION B-B.

## C.

### STATEMENT OF THE CASE.

Application for writ of supervisory control.  This proceeding was instituted for the purpose of having vacated an order of the district court of Silver Bow county adjudging the relators guilty of constructive contempt in violating the injunction contained in the decree in the cause entitled *"Montana Ore Pur. Co. v. Boston & Montana C. C. & S. M. Co.,"* referred to in this proceeding as the *"Pennsylvania Case."*  That cause was heretofore before this court on appeal, and the decree entered by the district court in favor of the plaintiff was modified and affirmed. (27 Mont. 288, 70 Pac. 1114; 27 Mont. 536, 71 Pac. 1005.)

It is charged in the affidavit filed in the district court that the relator corporation and its co-relators, its agents, are or have been engaged in mining and removing ore from certain of the veins awarded by the decree in that case to the plaintiff.  It is admitted that the relators, as principals and agents, have been removing ores from the veins, but that they are embraced in the decree is controverted.

The veins in controversy are known in the litigation between the corporations in the *Pennsylvania Case* as Nos. 3, 10 and 7 of the Pennsylvania lode claim, alleged by the plaintiff to be parts of the discovery vein of the Rarus-Johnstown claim upon its dip beneath the surface of the Pennsylvania.  After a hearing in the district court all the relators were adjudged guilty, and were each sentenced to pay a fine of $300.

The decree in the *Pennsylvania Case,* as modified by this court, describes the discovery vein of the Johnstown-Rarus claim as having its apex within the surface boundaries of that claim, as crossing both the parallel end lines thereof, and as being exposed on its dip to the south within and beneath the surface of the Pennsylvania claim on the 700-foot level of the Rarus in No. 10 winze, in raise 27 from the 700-foot level to the 400-foot level and above, and in upraise 24 from what is known as the 400-foot level of the Snohomish or 600-foot level of the Rarus to its apex in the plaintiff's ground.  This vein and

the two lying to the north having their apices within the plaintiff's boundaries were adjudged to belong to the plaintiff to their lowest depths between parallel planes extending perpendicularly downward, one through the east end line of the Pennsylvania claim, and the other through the most westerly point of the conveyed portion of the Johnstown claim, and designated in the diagram accompanying the opinion on rehearing by this court as line "E Q." 27 Mont. 536, 71 Pac. 1005. The workings beneath the surface of the Pennsylvania and immediately to the south are very extensive. They are illustrated by numerous maps, sections and models submitted with the record in this case. To undertake to follow the witnesses who testified at the hearing by the aid of these maps, models, etc., through the 1,500 pages of evidence in the record, much of which was given by experts, and is extremely technical in character, and in this way to give a definite idea of the controversy, would be a hopeless task. For present purposes a sufficiently clear idea of it may be obtained from the accompanying diagrams illustrative of the contending claims.

Diagram 1 shows the position of the discovery vein in the Rarus and Johnstown ground at the surface. The veins in controversy are those indicated at the extreme southern portion of the diagram as veins 3, 10 and 7. The diagram shows approximately the position of these veins as they are illustrated in the testimony of the witnesses, at or near the 600-foot level of the Pennsylvania workings from the Pennsylvania shaft, which is located near the letter "B" at the end of the line B B in ground immediately south of the Pennsylvania claim. This level corresponds in depth substantially with level 900 of the Rarus workings from a shaft which is near the letter "A" in the Rarus ground at the north end of the line marked "A A." The vein marked "No. 11" is, according to plaintiff's contention, the discovery vein as it appears after passing over the enargite vein and in the levels above where it overtops 7 and 10, as hereafter pointed out. Its contention is, and in its evidence it attempted to show, that the discovery vein of the Rarus-Johnstown, on its

descent into the earth, has a flat dip not exceeding 45 to 50 degrees, and overtopping and cutting off the veins designated as "Enargite, Nos. 10 and 7," unites with No. 3 vein on the dip along a line beginning near the southeast corner of the Pennsylvania claim, and declining below the horizon toward the west at a very flat angle. It contends that veins No. 7 to No. 3, inclusive, also unite on the strike with the discovery vein near the southeast corner of the Pennsylvania claim, and thence pass out as one vein toward the east. This contention is illustrated approximately by Sections A and B B.

Section A is intended to represent a section of the country made by a plane passing perpendicularly downward along the heavy line A A on diagram 1, which follows substantially the direction of upraise 24 from the surface down to the 600-foot level of the Pennsylvania workings at the point Y. Upraise 24, called indifferently "Winze 24" and "Upraise 24," according to the plaintiff's contention, follows the discovery vein from the surface to the 600-foot level of the Pennsylvania. It is conceded that a short distance west of the plane of this section vein No. 3, or a branch of it, passes up beyond the line of union, and has its apex within the Pennsylvania surface boundaries. It has been extensively mined by the relator corporation by many levels below this line, and in ground to the south of the Pennsylvania, and for at least two levels above, all along from the line designated on diagram 1 as the "Supreme Court Line" to the point of union toward the east. It has a dip of 80 to 85 degrees, and, while it has not been followed from below into the Pennsylvania ground, the witnesses all agree that its apex will be found within the boundaries of that claim.

Section B B illustrates this condition in part, the short vertical vein passing upward from the 600-foot level in the Pennsylvania where the two veins actually unite on the dip being a portion of vein No. 3. This section was made along the broken line B B B (diagram 1), and through workings along that line. So, while it appears to be a plane section, it in fact distorts the

dip of the alleged overtopping vein, so as to make it appear much flatter than it really is. Besides, it has projected upon it, from the west, workings which extend along the direction of the line B B (diagram 1). Following on the plan, map and models the points of exposure of the discovery vein beneath the surface of the Pennsylvania claim as designated in the decree, they indicate that this passes across the Pennsylvania claim in the general direction of No. 11 vein, at an angle north, 60 to 70 degrees west. This condition the plaintiff seeks to conform to its theory of a union between this vein and No. 3 on the dip by testimony of witnesses—based partly, as it asserts, upon actual development of the vein at various points below the points mentioned in the decree, and partly upon projections through undeveloped ground —that, as the vein descends into the earth, the dip becomes much flatter. To illustrate: The witnesses testify that the vein has been developed by workings along the line B B in territory between the fault fissures to the west, as shown in Section C. These are projected to the east upon Section B B, and with reference to them some of the witnesses express the opinion that, if the vein extends from crosscut 754 (Section B B) on the dip it appears to have in these workings, it will intercept No. 3 vein in the Pennsylvania workings. The portion of the vein extending from this crosscut downward is projected through undeveloped country.

Section C is designed to represent the conditions along the line marked "Supreme Court Line" on diagram 1. It illustrates the contention of the relators. On this section the hanging wall of the discovery vein of the Rarus-Johnstown, as fixed in the decree, is designated "Hanging Wall." This is intended to show the dip of the vein along that line, just as 24 raise is intended to show it on Section A. The other points mentioned in the decree along the strike of the vein between these limits indicate the course of the strike of the vein across the Pennsylvania claim at the depth to which development had been made at the date of the decree. The lines passing diagonally across the face of

the section, and from left to right, apparently cutting the veins, indicate two parallel fault fissures descending through the Pennsylvania ground toward the northwest at an angle of about 50 degrees below the horizon.   These are supposed to reach the surface near the east end line of the Pennsylvania.

The contention of the relators is that Nos. 10, 7 and 3 veins are distinct and separate to the west of the point of union, having their tops or apices within the Pennsylvania surface, and ending against the fault fissures toward the west, and coming to the surface toward the extreme eastern portion of the claim. They contend that No. 11 is a separate and distinct vein from the discovery vein; that it cuts off on dip and strike all other veins that come in contact with it; that it is parallel on its strike and dip throughout with No. 7; that the latter, on its strike toward the east, unites with Nos. 10 and 3, and passes out into the territory toward the east from 20 to 25 feet south of No. 11 (diagram 1); that No. 11 also passes out in the same direction, not coming in contact anywhere with No. 7 or 10, either on the dip or strike; that it has a dip of about 80 degrees; that the discovery vein on its dip overtops the enargite vein, and, passing down behind No. 11 to about the 400-foot level of the Snohomish, or the 600 of the Rarus, is there cut off by No. 11, and does not again appear in the lower workings; and that No. 11 should appear upon Section A as extending upward from the Snohomish 400-foot level.   It is further contended that this vein is different in many of its characteristics from any of the other veins in the vicinity, in that it is between parallel clay seams, is exceedingly uniform in both dip and strike, has been developed both above and below the point of union with the discovery vein, and by its peculiar characteristics is readily recognized and traced.   It is said that the union between vein No. 11 and the discovery vein is clearly indicated by the difference in dip of the two, as well as by actual development in the ground.   It is further claimed that vein No. 7 is separated from vein No. 11 by country rock varying in thickness from 25 to 40 feet, entirely free from mineralization of any kind.   Upon these facts is

founded the further contention that none of the veins in contro-
versy were, or could have been, within the issues determined
by the decree in the *Pennsylvania Case.*

*Mr. A. J. Shores, Mr. C. F. Kelly, and Messrs. Forbis &
Evans,* for Relator.

*Mr. J. M. Denny,* for Respondents.

MR. CHIEF JUSTICE BRANTLY, after stating the case,
delivered the opinion of the court.

It is apparent from the foregoing statement of the conten-
tions of the parties as to the physical facts touching the situa-
tion of the veins in controversy that there is a wide difference
between them as to their relative rights. If the plaintiff's con-
tention be sustained, then veins 7 and 10 certainly belong to it,
and the relators were properly convicted, whatever conclusion
might be reached as to the ownership of vein No. 3 below the
alleged union on the dip between it and the discovery vein. On
the other hand, if the relator corporation be upheld in its claim,
veins 3, 7 and 10 belong to it, and the judgment of conviction
may not stand.

It is not proper for this court in this proceeding to analyze
the evidence touching the question of ownership, or to express
any opinion thereon. The theory upon which the plaintiff pro-
ceeded, and in which it was sustained in the district court, is
that the decree in the *Pennsylvania Case* embraced these veins,
though it does not specifically describe them, because develop-
ments made subsequent to its rendition demonstrate that they
are parts of the veins specifically described. As to veins 7 and
10, and the portion of 3 eastward of where it unites with the
discovery vein on the strike, the plaintiff says the facts are con-
clusive. To determine the correctness of this claim requires
an examination of the issues involved in that cause, and an
ascertainment of what falls within the description contained in

the decree. We have set forth in the statement the substance of the description. It does not extend, in terms, to any other vein or veins involved in the controversy than the discovery vein and those which appear to the north. It designates only certain points along the dip and strike of the former, and declares the plaintiff to be the owner of it to the depths. It does not refer to any vein or veins to the south, nor, though it has incorporated in it the findings of fact made by the court, does it refer indirectly to any such veins. This would not matter if the evidence tended merely to show trespass by the defendant corporation upon the same vein or veins at lower depths. Subsequent developments, however, tend to show conditions which could not have been contemplated by the parties or the court at the time the decree was rendered. For illustration: No. 3 vein is not mentioned in the decree, yet the facts adduced at the hearing tend to show that it has its apex in the southern part of the Pennsylvania claim. To determine its ownership would require, upon proper issues, a determination of the question where the apex actually is, as well as the fact of the union between it and the discovery vein, and also the relative priorities of the dates of the Pennsylvania and Johnstown-Rarus locations. This determination would also require a consideration and determination of the fact whether or not the alleged overtopping vein is identical with the discovery vein, for upon a determination of these and other facts would depend the ownership of the united vein. There would be involved, also, an inquiry whether the defendant corporation has extralateral rights upon No. 3 vein. If there is in fact no union between these veins, then the defendant corporation is without question the owner of No. 3 vein. If there is a union of them on their strike toward the east, and they become one from that point, still this does not determine the ownership of No. 3 to the west of the point of union—the very portion of it where the alleged trespasses have occurred.

It may be said, also, of the other two veins in controversy, that, if their apices are to be found in the Pennsylvania claim, as they rise up to the fault or surface to the south of the dis-

covery vein, or vein No. 11, according to the theory of the relators, then they are the property of the relator corporation.

It cannot be said of the evidence that it demonstrates the plantiff's ownership of any of these veins. This court would hesitate to so find upon the facts in this record, even in an action brought for the purpose of determining the question of ownership. Much of it is speculative in character, and is based upon projections made upon conclusions from facts observed in workings remote, in some instances, by hundreds of feet from the particular points in controversy. Under these circumstances the conviction should not be sustained.

One fact, however, appearing from the record of the *Pennsylvania Case,* demonstrates that the action of the district court in this proceeding cannot be justified. The pleadings presenting the issues in the *Pennsylvania Case* were introduced in evidence. From them it is apparent that the points in controversy here were not involved in the action, and therefore could not have been embraced by the decree. At the close of the evidence the plaintiff asked and obtained leave to amend the complaint. The amendment was made. This required an amendment to the answer, which set up the fact, as matter in abatement of the action (see statement preceding opinion in *Montana Ore Purchasing Co. v. Boston & Montana C. C. & S. M. Co.,* 27 Mont. 288, 70 Pac. 1114), that the suit had been brought originally as an action at law for damages for trespass by the defendants upon the points in controversy in the action, and equitable relief had been sought only as ancillary to the law action; and that, as the action had been dismissed as to the count for damages, the count for ancillary relief should also be dismissed. A count for damages set up in the original complaint had, as a matter of fact, been dismissed, and the defendant thus sought to have the action abate as a whole. The replication of the plaintiff to this answer contained the following: "And plaintiff denies that at the time of the commencement of this action it commenced an action at law to recover from the defendant for alleged trespass upon the veins claimed in this action by the plaintiff, or

that it made the allegations therein which are stated in defendant's answer to plaintiff's amendments to its complaint, but avers the fact to be that at the time of the commencement of this action there were included in the complaint two causes of action—one at law for the recovery of damages for ores extracted by the defendant from veins within the Pennsylvania lode claim, which were alleged to have their tops or apices in the Johnstown lode claim, and the parcel of ground owned by the plaintiff; that said veins referred to in said cause of action lie far to the south of the veins which have been developed by the workings made by the plaintiff within the Pennsylvania lode claim." Inasmuch as the court found all the issues for the plaintiff, and the evidence in this record shows conclusively that these veins are the only ones within the Pennsylvania claim south of the discovery vein, it is manifest that they were excluded from the issues, and hence the title to them could not have been determined.

Under the circumstances presented in this record, contempt proceedings are not the appropriate remedy. Where the title to property has been once finally adjudicated, and it appears from the judgment record, or from the record supplemented, if necessary, by evidence identifying the subject-matter, that this is the case, and that the defendant has been enjoined from further interference, contempt proceedings must be resorted to. (*Montana Ore Purchasing Co. v. Boston & Montana C. C. & S. M. Co.*, 27 Mont. 410, 71 Pac. 403.) This was held in the case cited with reference to the same veins now in controversy, the theory of this court being that, as the complaint alleged ownership in the plaintiff under the decree rendered in the *Pennsylvania Case* (27 Mont. 288, 70 Pac. 1114), it would be most effectively enforced to prevent trespass in violation of the injunction contained therein by contempt proceedings, these furnishing a complete and adequate remedy. Now, it appears that the claim made in that case is not true, and that contempt proceedings have been resorted to to adjudicate and settle title to property in no way affected by the decree. This may not be

done. Such proceedings are not appropriate. For this purpose there must be issues presented by formal pleadings in an appropriate form of action at law or in equity, after due notice, when the parties may be heard in the usual way. And it must always be the case where there is a *bona fide* controversy as to ownership of property which has not been adjudicated; otherwise a party might be summarily deprived of his property without due process of law. This rule may be deduced from the following authorities: *Ex parte Hollis,* 59 Cal. 405; *State ex rel. Boardman* v. *Ball,* 5 Wash. 387, 31 Pac. 975, 34 Am. St. Rep. 866; *Wirt* v. *Brown,* (C. C.) 30 Fed. 187; *Onderdonk* v. *Fanning,* (C. C.) 2 Fed. 568; *Temple Pump Co.* v. *Goss Pump & R. B. Mfg. Co.,* (C. C.) 31 Fed. 292; *Baldwin* v. *Hosmer,* 101 Mich. 119, 59 N. W. 432, 25 L. R. A. 739; *In re Paschal,* 10 Wall. 483, 19 L. Ed. 992; Beach on Receivers, Sec. 241.

Counsel for respondents in this proceeding invoke the rule that "a judgment is conclusive upon the parties, not only as to such matters as were in fact determined in the proceeding, but as to every other matter which the parties might have litigated incident to or essentially connected with the subject-matter in litigation, whether the same, as a matter of fact, were or were not considered." We shall not now stop to consider whether this is a correct statement of the rule under the statute and the decisions of the state. (Code of Civil Procedure, Sec. 3196; *Campbell* v. *Rankin,* 2 Mont. 369,; *Meyendorf* v. *Frohner,* 3 Mont. 318; *Kleinschmidt* v. *Binzel,* 14 Mont. 54, 35 Pac. 460, 43 Am. St. Rep. 604.) As we have already pointed out, the rule does not apply to the circumstances of this controversy, for the reason that the issues in the case in which the decree was rendered expressly excluded a consideration of the situation and ownership of the veins in dispute.

Counsel for relators have devoted a considerable portion of their argument to questions touching rulings of the court in admitting and excluding evidence upon the hearing in this proceeding in the court below. As the order must be vacated, it is not necessary to consider these questions.

The order of the district court is vacated with directions to dismiss the proceeding.

*Order vacated.*

MR. JUSTICE HOLLOWAY: In order to support a conviction in a contempt proceeding, the proof of guilt ought to be clear and convincing, leaving no reasonable doubt of such guilt. For the reason that the judgment roll in the *Pennsylvania Case*, together with the other evidence received on the hearing in this proceeding, does not furnish that convincing proof that veins 3, 7 and 10 were adjudicated in the *Pennsylvania Case*, I agree with the order vacating the order of the district court holding relators guilty of a violation of the decree in that case.

Nothing said in the determination of this proceeding should be susceptible of any interpretation which would apparently indicate an opinion of the court as to the actual ownership of the ore bodies in controversy, or as to the effect of the testimony given, aside from holding it insufficient to support the order of the court below.