**MOULTON MINING CO. et al. v. ANACONDA COPPER MINING CO.**

Circuit Court of Appeals, - Ninth Circuit.
January 9, 1928.

Rehearing Denied with Modification March 19, 1928.

No. 5143.

**1. Mines and minerals ⬅30—To constitute "lode," ore bodies must come from same source, impressed with same form, and must appear to have been created by same processes.**

While structural boundaries are not always necessary to constitute vein or "lode," there must be ore bodies coming from the same source, impressed with the same form, and appearing to have been created by the same processes.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Lode.]

**2. Mines and minerals ⬅38(18)—Evidence held to sustain finding that ore within defendant's vertical boundaries was not part of vein apexing within claims of plaintiff (Rev. Codes Mont. 1921, § 9479).**

Finding in suit to quiet title to mining claim, under Rev. Codes Mont. 1921, § 9479, that plaintiffs failed to establish that ore within vertical boundaries of defendant's claim was part of veins which had their apex within claims of plaintiff, held proper under evidence.

**3. Mines and minerals ⬅38(14)—Plaintiffs had burden to prove their extralateral rights extended to defendant's mining claims.**

Plaintiffs, claiming mineral rights in ore as against defendant, had burden to prove extra-

lateral rights on ground that defendant's claim apexed within plaintiffs' vein.

**4. Mines and minerals ⬅38(14)—Defendant, denying plaintiffs' extralateral rights, was required to overcome plaintiffs' showing that defendant's claim apexed within plaintiffs' vein.**

Where plaintiffs showed defendant's mining claim apexed within limits of plaintiffs' vein, it devolved on defendant, endeavoring to deny plaintiffs' extralateral rights, to overcome the showing made.

**5. Mines and minerals ⬅38(18)—Evidence held to require finding that plaintiffs' extralateral rights extended to segment of defendant's claim having its apex within boundaries of plaintiffs' claim (Rev. Codes Mont. 1921, § 9479; 30 USCA § 41).**

In suit to quiet title to mining claim under Rev. Codes Mont. 1921, § 9479, evidence held to require finding that plaintiffs' extralateral rights extended to defendant's claim as to segment of claim found to have its apex within boundaries of plaintiffs' claim; there being no intersection and crossing, within meaning of Rev. St. § 2336 (30 USCA § 41).

Appeal from the District Court of the United States for the District of Montana; George M. Bourquin, Judge.

Suit in equity by the Moulton Mining Company and others against the Anaconda Copper Mining Company. Decree dismissing plaintiffs' complaint (20 F.[2d] 1008), and plaintiffs appeal. Modified and affirmed.

Wm. E. Colby, of San Francisco, Cal., W. A. Clark, Jr., and J. L. Templeman, both of Butte, Mont., and John C. Higgins, of New York City, for appellants.

L. O. Evans and D. M. Kelly, both of Butte, Mont., and Henry McAllister, of Denver, Colo., for appellee.

Before HUNT, RUDKIN, and DIETRICH, Circuit Judges.

HUNT, Circuit Judge. Plaintiffs appellants brought suit against defendant appellee to quiet title to the Poser mining claim at Butte, Mont. The suit was brought under section 9479, Montana Revised Code, which authorizes an action against any person who may claim any right, title, estate, or interest in real estate adverse to plaintiffs' ownership, whether such claim or possible claim be present or contingent, for the purpose of determining such claim, or possible claim, and quieting title to said real estate.

Plaintiffs alleged that they owned and possessed the Poser claim, and all veins, lodes, and ledges having their tops and apexes therein through their entire depth or downward course, measured between vertical planes passed through end lines; that de-

fendant owns a group of mining claims adjoining the Poser claim on the south, all being subsequent in time of initiation and location of rights to the rights of the Poser; that within the Poser claim is the Rainbow lode, discovery vein of the Poser, the entire width of the apex of the Rainbow being included within the surface boundaries of the Poser claim for its entire length, and crossing both end lines of the Poser; that there is, also within the surface boundaries of the Poser claim, the Poser vein, which extends longitudinally throughout the claim from end line to end line, and also a vein or lode, for convenience designated the Intermediate vein, the entire apex of which extends longitudinally throughout the Poser from end line to end line; that the Poser and the Intermediate dip southerly and penetrate underneath the surface of the adjoining group of claims of defendant; that in the Poser claim, between the 1,000 and 1,300 levels of the workings, the Poser vein crosses and extends beyond the vertical plane, passing through the southerly side boundary of the Poser claim, and is found running down beneath the surface of the adjoining claims of defendant; that defendant claims an interest adverse to plaintiffs in and to the Poser and Intermediate veins, and particularly those parts of the Poser and Intermediate which lie vertically beneath the surface of the defendant's group of claims, and between the Poser end line planes produced southerly as described, and has at various places penetrated each vein with its mine workings; that the claims of defendant, as to its ownership of the said claims of the Poser and Intermediate existing vertically beneath the surface of defendant's group, and between the Poser claim end line planes produced as aforesaid, are groundless, and a cloud upon the title of the plaintiffs to the Poser and Intermediate veins as described, which are a part of the Poser claim, and that defendant has no right in or to said extralateral claims of either the Poser or the Intermediate vein, as described in the complaint, or to any portion thereof; that defendant penetrated into extralateral parts of the Poser and Intermediate veins as described, and extracted valuable ore, and threaten to continue workings upon said extralateral portions of the Poser and Intermediate veins.

The prayer is that defendant be required to set forth the nature of its claim to said extralateral portions of the Poser and Intermediate veins or lodes described, and that all adverse claims to the same or any portion thereof be determined by a decree of the court; that it be adjudged that defendant has no estate or interest whatever to any portion of the Poser or Intermediate veins as described in the complaint; that plaintiffs' title be decreed to be good, that injunction issue, and that accounting be had.

By answer defendant admitted its ownership of a group of mining claims adjoining the Poser claim on the south; alleged ownership of all veins and ore bodies within the surface boundaries extended downward vertically of such claims south of the Poser; alleged that the Rainbow lode has its apex within the surface boundaries of the Poser claim for its entire length; denied the existence of the "alleged and pretended" Poser and Intermediate veins or lodes, or of any segment, spur, or branch thereof, or that defendant claims any ownership of any segment or segments of said veins; denied that it mined any ore which belonged to plaintiffs, and prayed for a decree dismissing the complaint.

Upon the trial it was stipulated that the Poser claim was prior in time in discovery and location to the claims of defendant to the south, and that discovery on the Poser was made on the Rainbow lode at the west end line of the claim as described in the patent.

Certain admissions of the respective parties as to ownership and possession of their respective mining claims narrowed the main issue to the question whether the Poser and Intermediate veins existed as alleged. Some advance was made in solving that issue as to the Intermediate vein by the admission of defendant that there was a vein called the Intermediate, branching from the Rainbow in the Poser subsurface. At the close of the trial the defendant admitted that part of a vein, called by plaintiffs their Intermediate vein, but which defendant called the View vein, was the property of plaintiffs to an extent as follows:

"In so far as the plaintiff has the apex of the View vein at any place westerly from the point where the Emily crosses the south side line of the Poser claim, they are entitled to all ore and minerals in the View vein between the plane of their west end line and a parallel plane drawn down through the point where the Emily crosses the south side line of the Poser."

Much testimony was heard, and the court, in a carefully considered opinion, held, substantially, that the Poser claim is located on and lengthwise of the Rainbow, of northerly dip and east-west age; that both are intersected by the Emily vein of northeasterly

dip and northwest age; that the Emily vein at the surface enters the Poser claim 370 feet west of the southeast corner, and departs 50 feet east of the northwest corner; that at the surface a vein, called Poser by plaintiffs and Pilot by defendant, enters the claim at the southeast corner, dips northerly, running northwesterly to the east side of the Emily; that at some depth the Intermediate vein branches from the south side of the Rainbow west of the Emily, dips southerly, and runs easterly; that there are other veins in the Poser; that the Black Rock fault of southerly dip courses through the Poser claim from end line to end line; that within defendant's claims are veins which apex in defendant's ground; that of these veins some (which are named) are of east-west age, with southerly dip and easterly and westerly strike; that there are also the Emily and one other vein of northwest age, having northeasterly dip and northwesterly strike; that the Black Rock fault is also within these claims; that from 100 to 800 feet south of the Poser claim, and from 1,300 to 3,000 feet in depth, there are extensive bodies of ore within defendant's vertical boundaries, with apexes in defendant's ground; that, inasmuch as none of the ore bodies are in the Poser or Pilot vein east of the Emily vein, the questions for decision were (1) the existence of the Poser vein west of the Emily vein, and (2) the relation of the Intermediate vein to the small ore body on the 2,800-foot level. It was found that what is called the Poser vein was not a vein of the true fissure type characteristic of the Butte district, but merely a conjugated fracture and stock work and of vein segments, and on the east end was made up from the Pilot vein, belonging to plaintiffs.

With respect to the second main question, it was found that the ore body, found on the 2,800-foot level and the Intermediate vein, was between two parallel veins of northwest age, 100 to 200 feet distant; that plaintiffs' raise from the ore body was not in a single plane, but in offset raises; that it could not be presumed that the vein could be projected through; that in the raise from the ore body to the 2,600-foot level the plaintiffs reach close association between the vein of southerly dip which they were following and the defendant's Mill vein of northerly dip, but that it was doubtful whether they united or intersected; that on the 2,600 level plaintiffs drifted 350 feet northwesterly, raised to the 1,700-foot level, drifted southeasterly and through the 1,736 raise to the 1,500-foot level; that in the raise there is a vein which

continues to and includes the ore body on the 2,800-foot level; that the Intermediate vein, being of east-west age, and the Emily, of northwest age, would not unite, but that, if the vein in the 1,736 raise and the Emily did unite, the vein in the raise is a branch of the Emily, and is not the Intermediate vein; furthermore, that if the vein in the 1,736 raise was not proven not to unite with the Emily, where it was in such close relation as to suggest union, then under the evidence it could not be regarded as the Intermediate vein.

It was also held that plaintiffs failed to prove that the vein in the 1,736 raise is not a branch of the Emily, and does not unite with the Emily, or that it is the Intermediate vein; that in the 1,550 drift the Intermediate vein is strong, and at 1,583 cross-cut, reduced in size, it departs northeasterly from the 1,550 drift from which point to 1,736 raise is a region of small seams, faults, veins, and branches; that from or near the 1,583 cross-cut is a small vein, 6 to 12 inches wide, coursing southeasterly in 1,550 drift, dividing into two branches, which unite and redivide, the southern branch entering the 1,736 raise and being a vein in which is the ore body found on the 2,800 level; the northern branch continuing into 1,550 drift as it curved from north to southeast around the 1,736 raise; that there it converges to the Emily vein, the two forming an acute angle; that the northern branch referred to and the Emily united (the northern branch being a branch of the Emily) is of northwest age, as is the southern branch, which united with the northern branch; that the southern branch in the 1,736 raise is not the Intermediate vein of east-west age, and that the ore body in the 2,800 level is not in the Intermediate vein, but is in a branch of the Emily vein.

Decree was entered, dismissing the complaint, and plaintiffs appealed.

Assignments of error question the decision awarding to appellee that segment of the Emily apex 370 feet west of the Poser's southeast corner, covering the ore body in dispute and in appellee's ground, and not awarding to appellants the ownership of the extralateral segment of the View vein and the ore and minerals found in it to the west of the 370-foot point where the Emily apex crosses the south Poser side line, measured between the conceded limiting extralateral planes.

Assignments also predicate error upon the failure of the court to find that the Emily vein was joined by the View vein beneath the surface, was cut off and thrown by the Black

Rock fault, and thus that there was created a subfault apex, or a vein segment, and that such subfault apex extended longitudinally within the vertical boundaries of the Poser claim from the east end line of the Poser westward for several hundred feet; also, upon the findings that appellants were asserting a right to follow the ore body in question on strike, rather than on dip, and that the View and the Intermediate were separate veins.

The substance of the assignments with relation to the Poser vein is that the court erred in holding that the Poser vein was not in legal contemplation a vein, and in not quieting appellants' title in and to the Poser vein, as described in the complaint, to the full extent thereof as it extends on its downward course beneath the surface of the adjoining mining claims of appellee.

Understanding of the whole case is simplified by reference to the generally recognized geological characteristics of the Butte district. Put in the briefest way, it is generally agreed by learned scientists that in that district there are several ages of veins, the oldest of which is known as the east-west, or Anaconda, system. That is described as consisting of a large number of strong east-west mineralized fissures; the larger veins therein generally having a dip to the south in the south and southeasterly part of the district, while in the north and northeasterly parts the veins generally have a northerly dip. Explanation of this changing dip of the veins is that the dip corresponds to the change in strikes. The east-west veins are characterized as large and complex, and composed of a number of closely spaced parallel veins, with many cross connecting stringers or fissures, which are sometimes large enough to constitute separate veins as mines. The next oldest system is spoken of as the Blue vein system, in which the veins are generally of northwesterly-southeasterly direction, and generally cut through and fault the earlier veins. The Blue System is regarded as large, with veins that are persistent on strike, and, like the veins of the east-west system, have many branches, with like parallel veins, and show much alteration or fracture along the sides of parallel veins. The next, and still younger, veins are referred to as Steward veins, or those striking northeast, having less mineralization and fewer ore bodies than have the Blue and the east-west veins. They are fault veins, rarely encountered in the Butte district. With all of the above vein systems, alteration of the granite is found more extensively in the east-west system than

in the Blue vein system, and still less in the Steward veins. Of importance, too, in the district, are certain post-mineral faults, faulting the ore bodies in segments or fragments. Among these is the strong Black Rock fault, which cuts through the Rainbow and Blue veins, and extends through the Poser claim into the Elm Orlu on the east.

[1] The question of the existence of the alleged Poser vein presents difficulty, in solving which we have kept in mind the argument of the appellants that, while the existence or nonexistence of a vein is often dependent upon mixed questions of law and fact, in this instance the evidence of mineral showing and of the physical characteristics of a vein are so strong that as a matter of law the only conclusion that could properly be reached was that it was a vein. Fundamentally, of course, we are guided by the well-recognized knowledge that in the complexities of lodes, with indefinite and irregular walls, while the mineral association of rock in place is an essential element in the definition, the nature of the material, the form of the deposit, and the character of the boundaries are often variant (Lindley on Mines, § 294, p. 265; Iron Silver Co. v. Cheesman, 116 U. S. 529, 6 S. Ct. 481, 29 L. Ed. 712; Star Mining Co. v. Federal Mining Co. [C. C. A.] 265 F. 881), and that it is not necessary for the formation of a disseminated lode that there should be any walls or any sheering. "It simply requires a more or less porous rock through which the solutions may pass. * * * They may have indefinite boundaries." Thus, while what are spoken of as structural boundaries are not always necessary to constitute a vein or lode, there must be ore bodies coming from the same source, impressed with the same form, and appearing to have been created by the same processes.

Plaintiffs introduced much testimony in support of their contention, but beyond mentioning a few points it is unnecessary to set it out at length. Much of it tended to show that on the 1,000-foot level the proportionate amount of mineralization, as disclosed by assays of the Poser vein at the west end of the claim, has less copper and zinc, but more silver and lead, than the appellee's Pilot vein at the east end, and that the Poser at the west end, though showing less copper and lead, had considerably more silver and zinc. Some of the witnesses made comparison between the vein portion which the appellants claim to be the Poser west of the Emily with the Pilot, admittedly a vein east of the Emily above the 1,000-foot level, and said that in

some places the raises of the disputed Poser vein in that part which appellee says is only the Black Rock fault, higher assay values were obtained from samples than are shown in the vein admittedly found in the east end raises down to the 1,000-foot level.

Witnesses described the results of tests of material taken at the west end of the Poser under a designated raise (A–1034) as disclosing double the quantity of copper, more silver, more zinc, and decidedly larger proportion of lead than there is in the Pilot vein at the east end of the claim in the A–1034 raise. They also said that on the west end of 747–A raise in the Poser vein, while there is less copper and less zinc, there is more lead and silver than in the Pilot in the east end at the 726–A raise, and that in the 351–A raise in the Poser there was less copper, zinc, and silver, but more lead, than the Pilot showed at the 310–A raise; also that in the 1561–B winze, where there is a vein, said to be the North Badger, and in the 1561–A winze, the Black Rock fault appears, but that assays from material taken from each of these workings disclose that, in the so-called North Badger vein in the winze, the average mineralization is no better than that found in other workings in that vicinity, and that the averages of assays taken in those sections, said by appellee to carry the Black Rock fault, show a higher degree of mineralization than is shown on the North Badger.

Assay exhibits used for making comparisons between the averages of mineralization in different parts of the Poser above the 700-foot level and the mineralization of the Pilot vein east of the Emily, with the mineralization of the entire Poser west of the Emily and with the mineralization of segments of the Poser, were introduced with computed results which showed weaker mineralization of the Pilot than of the Poser west of the Emily. As an illustration of their contentions, appellants divided the Poser west of the Emily into three segments, including (1) the first 230 feet west of the Emily; (2) the adjacent 100 feet westerly; and (3) 70 feet still further westerly. Their tabulations disclose that in the first 230 feet there is less copper, silver, and zinc than there is in the section adjacent and one foot to the west, and that in the first section, when compared with the Pilot vein east of the Emily, there is disclosed more copper and silver than is to be found in a section of the Pilot, and that each segment of the Poser west of the Emily was somewhat better mineralized than the Pilot vein.

On the other hand, there is no doubt of the fact—we do not understand that the contrary is advanced—that the average of the assays of the Poser above the 1,300-foot level for the full length of the claim does not approximate commercially valuable ore. But experts, some of whom have had long experience in the study of geological and mineral conditions in the Butte district, testified in behalf of appellee that many of the assays made by plaintiffs were from material taken from a selected poorly mineralized slice of a vein other than the Poser, and therefore, when compared with assays taken from the Poser, demonstrate practically nothing in determining the vein character of either structure. They referred to the accepted fact that the great Rainbow lode, between the lines of the Poser claim and above the 500-foot level, has furnished little or nothing in the way of commercial ore, that assays from it would show nothing, and yet that the Rainbow structure has an average width of 70 feet, with mineralization in a strong typical vein, easily recognized and followed.

Then, too, there is appellee's evidence that the reliable method of sampling in the Butte district is to take separately ore streaks, mineralized ground, gouge, or waste, or other material in the working samples, and to show the assay result of each character of material separately—a method which seems to have been at variance with that pursued by appellants, who took samples across the workings at regular intervals. After sampling the Poser down to the 2,000-foot level, plaintiffs stopped, because of the fact that the workings themselves showed ore and veins. One of the defendant's mining engineers and geologists, in explaining a map of the outline of the workings of the 1,300-foot level of the Elm Orlu mine, testified that he sampled practically all of the crosscuts in making a determination of the granite alongside of the Black Rock fault; that in sampling crosscuts or drifts a convenient sampling interval was decided upon as 5, 10, or 20 feet, and the points were marked; that at each of the points to be sampled an examination was made from side to side at the back of the drift; that, when those points were marked, samples were taken with the right amount of material from every section of the cut, and that such method continued at each particular sampling point throughout the investigation; that in examining the 1,300-foot level he went into several of the crosscuts and attempted to compare the mineralization with the alleged walls of the Poser vein as depicted upon certain of the exhibits of the plaintiffs; that he

found the average metal content of a given specified portion of a crosscut included in the Poser as described by plaintiff's was a lower degree than the average metal content of the rest of the crosscut; and that like instances were presented on the same level at other crosscuts.

[2] In an effort to arrive at convincing results from the divergent methods testified to, and to deduce entirely satisfactory conclusions therefrom, the District Judge referred in detail to the assays as not impressive, and as of little weight in determining whether the Poser is a vein for the 400 to 600 feet west of the network structure described by geologists as largely Black Rock fault, with a few segments of veins cut by the fault. With the weakening of the force of assay testimony, the evidence of the geology became the potent influence toward a definite conclusion. As to that there were the opinions of learned specialists, saying in part that they found no fissure without the fault, and no throw of the Poser vein, where cut by the Black Rock fault, with a normal throw of 160 feet; that the Poser was not of the Steward age, and that it showed marked differences west of the Emily from what was shown east of the Emily.

The difficulty of arriving at a well-sustained result is exemplified by mentioning the fact that the principal witness for the defendant, a geologist, who testified that what was called the Poser lacked the characteristics of a fissure vein, had, in a technical article written some years before, described the Poser vein as of the Steward age. It is to be presumed, of course, that more recently acquired knowledge has brought about a modification of his first opinion; but the very circumstance illustrates the closeness of the crucial question. We leave it, satisfied that the conclusions of fact as found have substantial support in the evidence, and that upon the facts found it was not error to hold that there was no Poser vein at the places indicated.

In adjudging that appellees had the right to the ore within the plane measured 370 feet westerly from the Poser claim east end line, the court found that the Emily apex was outside and south of the Poser claim. The predicate for that opinion was that in that section the vein called the Poser was the Pilot in appellee's claim, a vein of northwest age, with westerly trend through it, and not extending at all west of it. The conflicts in the testimony upon the question whether at the points east of the Emily the veins were of the Pilot, of northwest age, were many and hard to reconcile; but the major conclusion that the Pilot was not found west of the Emily rests upon substantial evidence and must stand.

We next turn to appellants' contention that the court should, at least, have awarded plaintiffs extralateral rights on the View vein west of the 370-foot point, where the apex of the Emily crosses the south side line of the Poser claim. At the outset appellee says that appellants advanced no such contention in the District Court, and that there is no assignment of error based upon the omission of the trial court to award to appellants the vein segment referred to. But, as hereinbefore set forth, the complaint alleged that there is a vein, conveniently referred to as the Intermediate, which has its apex for its full length in the Poser claim, and dips southerly underneath the adjoining claims of the defendant and that the defendant was engaged in mining such Intermediate vein on the 2,600 and 2,800 levels, and the prayer is that plaintiffs' title to the Intermediate vein, as described in the complaint, be adjudged good and valid, and that the defendant be enjoined from asserting any adverse claim thereto between the Poser extralateral planes passed through its end lines. The vein thus described necessarily included the vein segment in controversy. The answer met these allegations, and the assignments of error are sufficient to call for examination of the question presented.

The finding that the Intermediate vein did not extend outside of the vertical boundaries of the Poser claim and that the Intermediate, as a branch of the Rainbow, did not extend extralaterally down to and include the ore bodies in controversy, involved only one of the vein segments which the plaintiffs had described as the Intermediate vein, and but partially responded to issues and to the prayer for a decree quieting title to the vein which extended extralaterally beneath defendant's surface. If the identity of the vein was established as the subject of the controversy, the fact that it was called by appellee the View vein is not of vital importance. To go at length into the evidence seems unnecessary; hence we shall mention but a few of the more prominent points.

Are the View and the Intermediate separate veins? The View vein is disclosed in the workings beneath the surface of the Poser, where the Intermediate is admitted to exist. The View vein appears to be coincident with the Intermediate; it also conforms to the

description of the vein in the complaint, to which plaintiffs claim title, and which they assert extends extralaterally. It was after evidence tending to show these facts appeared, and plaintiffs urged that they were entitled to the entire vein extralaterally from one end line plane to the other end line plane of the Poser claim, including the segment west of the Emily apex crossing, that defendant made the admission that, in so far as plaintiffs had the apex of the View in places westerly from the point where the Emily crosses the south side line of the Poser, plaintiffs were entitled to all ore in the vein between the plane of the west end line and a parallel plane drawn down through the point where the Emily crosses the south side line of the Poser.

That admission is to be construed with the decision of the trial court that the View vein is a branch of the Emily, and that the Emily had its apex in the defendant's ground for the easterly 370 feet of the length of the Poser claim. That fact, so found and accepted, was, as we understand the reasoning of the District Court, the foundation for the judgment that the defendant was entitled to the ore bodies in dispute and embraced within the 370-foot extralateral easterly sweep. It was supported by exhibits and oral evidence that the View and the Emily join at a point, not west, but east, of the Poser claim in the end of the 1,550-foot drift; nor does the evidence show other joinder west of the Poser east end line. But there was evidence that, in the cross-sections through the Poser claim, beginning at the Poser east end line and running west as far as the middle of the Poser claim, the View vein courses up into the subsurface of the Poser, across the Poser south side line plane; that it is seen coming up with apparent regularity, which impels the opinion that on its north of west strike it will meet the Emily under the Poser surface, farther under as the course proceeds westerly.

We find the View or Intermediate vein on the 1,000 level. About 600 feet west of the east end line of the Poser, and north of the south side line, a joining or union is found; the Emily dipping in a direction opposite to the View and overhanging at points. It is not seen, however, in the 500 or 700 levels. It extends down to the 3,000-foot level east of the segment being inquired about; is also found extending for 300 feet west of the 370-foot plane on the Poser 2,200 level, in the westerly end of one of the drifts; it extends west beyond the 370-foot

plane lying vertically beneath appellee's surface. Appellee's suggestion, that at the 2,800 level the stopes of the View vein strike northwesterly at an acute angle from the east end line plane of the Poser, does not appeal persuasively, especially in view of the evidence that the angle which the average strike the View vein makes with the Poser east end line plane is greater than 45 degrees. Last Chance Mining Co. v. Bunker Hill Mining Co. (C. C. A.) 131 F. 579.

Appellants urge with telling force that the court, having held the View to be a branch of the Emily, and having taken the View on a reverse dip to an apex outside and south of the Poser ground, necessarily adopted the presumption that it extended westward to the Poser claim; hence that, by parity of reasoning, it is to be presumed the vein exists in the extralateral area to the west of the 370 foot plane.

The junction as found was upon an exposure east of the Poser line. In our opinion, plaintiffs' position is tenable. There is also the evidence showing the View on one of its branches running west of the 370-foot plane and lying vertically beneath the surface of one of appellee's claims; that the View dip is southerly within the subsurface. A quirk in what appellee terms a branch of the View vein is found in a stub raise, an extension of the 1736–A raise, some few feet east of the Poser east end line plane, far east of the 370-foot plane. The exposure referred to appears as one of two branches, where the District Court said identity and correlation were difficult. We do not think the quirk justifies the opinion that there was a reversal of the dip, for cross-sections expose the View vein crossing the Poser south side line plane and extending up into the Poser claim on uniform dip for nearly 1,000 feet, and to a distance not far from the Emily, with which the court found it would unite. The weight of evidence is against the reversal of the dip.

Additional citations from the evidence tending to show that the apex of the View is within the Poser limits could be made. Considered together, they are enough to support the proposition that the apex of the View, found by the court to be for a distance of 370 feet outside of the Poser surface claim limits, is presumed to continue to the west of the point where it crossed into the Poser claim.

[3-5] Plaintiffs always had the burden of proof as to the extralateral rights; yet when it was shown that the vein involved in the lit-

igation extended up from the disputed ore body, and passes beneath the surface of the Poser claim in such a position toward the boundaries of the plaintiffs' claim that the apex of the extralateral claimants' mining claim would apex within its ground, it devolved upon defendant, endeavoring to deny the extralateral rights, to overcome the showing made. Throughout our examination of the case we have kept in mind the relationship of the Black Rock fault, which would cut off the Emily continued upward. It may be that, where the merged vein is against the Black Rock fault on the foot wall side, that it ends there, and that an extension upward above the fault cannot be found. If this be so, the theory of a subsurface fault is not to be lightly put aside. The admitted displacement of the Black Rock fault, even as much as 200 feet, gives countenance to that theory. State v. District Court, 30 Mont. 96, 75 P. 956.

It is certain that for distances of hundreds of feet there is contact and merger on dip and strike underneath the surface of the Poser claim and within the boundaries of that claim. There is coincidence but neither intersection nor crossing, within the meaning of those terms in section 2336, Revised Statutes of the United States (30 USCA § 41). Reading the evidence convinces us that the most reasonable deduction is that the View has not been distinguished from the Intermediate branch of the Rainbow, and that they must be regarded as one for the determination of extralateral rights within the western segment, and that the apex of the Intermediate should be held to be the apex of the View, too, and that the Intermediate, as a branch of the Rainbow, apexes in the Rainbow, and thus the Rainbow becomes the apex of the Intermediate for the segment under consideration.

From what we have said, it follows that in so far as the decree dismissed the complaint as to the existence of the Poser vein, and as to that segment of the vein lying east of the 370-foot point on the Poser south side line, it is affirmed; but it is amended by awarding to the plaintiffs that segment of the View vein, and all ore and minerals in that vein, west of the Emily crossing—that is, between the plane of their west end line and a parallel plane drawn down through the point where the Emily crosses the south side line of the Poser, and quieting plaintiffs' title thereto.

As so amended, the decree is affirmed. The costs in this court and in the District Court are ordered to be equally divided.